[No. 50591–8. En Banc. August 6, 1987.]

KAREN BLAIR, ET AL, *Appellants,* v. WASHINGTON STATE UNIVERSITY, ET AL, *Respondents.*

*Susan P. Graber, Laurel S. Terry,* and *Joyce M. Bernheim* (of *Stoel, Rives, Boley, Fraser & Wyse*) and *Ester Greenfield* (of *MacDonald, Hoague & Bayless*), cooperating attorneys for the Northwest Women's Law Center, for appellants.

*Kenneth O. Eikenberry, Attorney General, Sally P. Savage, Senior Assistant,* and *Paul Tanaka, Assistant,* for respondents.

*J. Kathleen Learned, Judith E. Schaeffer, Margaret A. Kohn,* and *Marcia D. Greenberger,* amici curiae for appellants.

DOLLIVER, J.—This is a sex discrimination action brought under the state Equal Rights Amendment, Const. art. 31, § 1 (amend. 61), and the Law Against Discrimination, RCW 49.60. Appellants are female athletes and coaches of female athletes at Washington State University. Respondents are Washington State University, its President, Executive Vice–President, and Board of Regents.

The trial court concluded the University had discriminated against the plaintiffs on the basis of sex and awarded damages, injunctive relief, attorney fees, and costs. The plaintiffs now appeal (1) the exclusion of football from the court's calculations for sports participation and scholarships; (2) the trial court's decision to allow each sport to benefit from the revenue it generates; (3) the reduction of the attorney fee award; and (4) the trial court ruling requiring them to file a claim under the tort claims act, RCW 4.92.110, as a condition precedent to bringing this suit. The University in its cross appeal challenges portions of the trial court's award of attorney fees and costs. Subject

to the discussion below, we reverse the trial court on issues (1) and (3), affirm on issues (2) and (4), and affirm on the issues raised by the University's cross appeal.

The comprehensive findings of fact of the trial court demonstrate that, despite marked improvements since the early 1970's, the women's athletic programs have continued to receive inferior treatment in funding, fundraising efforts, publicity and promotions, scholarships, facilities, equipment, coaching, uniforms, practice clothing, awards, and administrative staff and support. During the 1980–81 school year, the year before the trial, the total funding available to the men's athletic programs was $3,017,692, and for the women's programs was $689,757, roughly 23 percent of the men's. The funds for the men's programs were derived largely from revenues, both gate admissions ($958,503) and media rights, conference revenues, and guaranties ($943,629). Most of these revenues were derived from football ($1,430,554). Of the funding available to the women's programs, most was derived from legislative appropriations ($451,082). Very little came from gate admissions ($10,535). Although the number of participation opportunities for men increased by 115 positions from 1973–74 to 1980–81, the opportunities made available for women decreased 9 positions during the same period. The budget for men's scholarships increased from $380,056 to $478,052 during that period; the budget for women's scholarships in 1980–81 was $150,000. The trial court observed in its memorandum opinion:

> The non–emphasis on the women's athletic program was demonstrated in many ways, some subtle, some not so subtle. . . . The message came through loud and clear, women's teams were low priority. . . . [T]he net result was an entirely different sort of participation opportunity for the athletes.

On the basis of numerous findings of fact detailing the inferior treatment of the women's athletic program, the trial court concluded the University had "acted, or failed to act, in the operation of the University's intercollegiate ath-

letics program in a manner that resulted in discriminatory treatment of females . . ." The athletes had "suffered unlawful sex discrimination violative of RCW 49.60 and the State Equal Rights Amendment."

The court entered a detailed injunction to remedy the violations. With respect to funding, the court ordered the women's program must receive 37.5 percent of the University's financial support given to intercollegiate athletics during the year 1982–83. The required minimum percentage for women increased each year by 2 percent until it corresponded to the percentage of women undergraduates at the University, 44 percent at the time of the injunction. The trial court provided, however, the level of support for women's athletics was not required to exceed by more than 3 percent the actual participation rate of women in intercollegiate athletics at the University, excluding football participation from the comparison. The injunction prohibited the total budget for women's athletics ever to be less than the base budget of $841,145 for 1981–82, unless the expenditures for men's athletics were correspondingly reduced.

The injunction also specified:

> In determining the level of University financial support of intercollegiate athletics for purposes of the above calculation, the term "University financial support" shall not include revenue generated by or attributable to any specific sport or program. Such excluded sources of revenue shall specifically include gate receipts, conference revenues, guarantees, sale of media rights, concession and novelty sales at games, coach and athlete work projects, and donations attributable to a sport or program.

The injunction apportioned the funding for athletic scholarships in a similar manner. The women received 37.5 percent of all money expended for scholarships, excluding funds expended for football scholarships. The percentage increased yearly until it equaled the percentage of women undergraduates. The allocation could not fall below $236,300, the amount allocated for 1982–83, unless matched by a reduction in male scholarships.

The court also ordered the University to allow for increased participation opportunities until female participation, again excluding football participation from the comparison, reached a level commensurate with the proportion of female undergraduate students. The court noted female participation had increased in recent years and stated in its memorandum opinion, "[t]he change in the last ten years is dramatic, and it seems possible that parity will soon arrive."

The court further required the University to take affirmative steps to make opportunities to generate revenue equally available to men's and women's programs, stating:

> Because past sex discrimination has afforded women's teams and coaches less opportunity to generate revenue, the University should take affirmative action in providing additional personnel with such knowledge and experience.

The trial court required the University to appoint a committee to monitor the application of the funding formulas and other elements of the injunction. The sex equity committee, comprised of students, coaches, and administrators, was also given the mandate to develop recommendations for policies concerning matters affecting sex equity in athletics and recommendations for the promotion of women's athletics. After approval by the Provost, the committee's recommendations are to be implemented and administered in an equitable and timely manner.

In addition to the injunction, the court awarded the plaintiffs monetary damages for certain tangible losses caused by the University's discriminatory policies. The plaintiffs contest the trial court's reduction of the damages award. The trial court held RCW 4.92.110 required the plaintiffs to file a tort claim with the State before bringing a discrimination action under RCW 49.60. The parties had stipulated that if RCW 4.92.110 did apply, the complaint would be deemed filed on September 12, 1980, and any damage award would extend back 3 years from that date. The court, accordingly, calculated the award based only on

injuries since 1977.

Finally, the court awarded the plaintiffs approximately $170,000 in attorney fees, expert witness fees, and costs. The court in calculating the attorney fee award concluded the plaintiffs had prevailed but reduced the award after finding the attorneys had duplicated some efforts and expended an excessive amount of time on some issues. The court also noted the plaintiffs' attorneys worked for a non-profit legal organization.

Appeal was made directly to this court. The University directed its notice of appeal from the award of costs and witness fees to the Court of Appeals, which sent the notice to this court. *See* RAP 5.3(g). Attorneys for the American Civil Liberties Union and other amici filed an amicus brief in support of the plaintiffs' position.

## I

█ The plaintiffs ask us to review two elements of the trial court's injunction. The standard of review of an injunction is whether the trial court abused its discretion in fashioning the remedy. *State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

### A
### FOOTBALL EXCLUSION

The first issue raised by the plaintiffs is whether the trial court abused its discretion in creating an injunctive remedy which excluded football from its calculations for participation opportunities, scholarships, and distribution of non-revenue funds. We conclude the trial court did abuse its discretion and reverse on this issue. The Equal Rights Amendment and the Law Against Discrimination prohibit such an exclusion.

The Equal Rights Amendment states:

Equality of rights and responsibility under the law shall not be denied or abridged on account of sex.

The legislature shall have the power to enforce, by appropriate legislation, the provisions of this Article.

Const. art. 31, §§ 1, 2 (amend. 61).

The Law Against Discrimination provides:

> The right to be free from discrimination because of race, creed, color, national origin, sex, or the presence of any sensory, mental, or physical handicap is recognized as and declared to be a civil right. This right shall include, but not be limited to:
>
> . . .
>
> (b) The right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement . . .

RCW 49.60.030(1)(b).

The recognized purpose of the Equal Rights Amendment is to end special treatment for or discrimination against either sex. *Marchioro v. Chaney,* 90 Wn.2d 298, 305, 582 P.2d 487 (1978), *aff'd,* 442 U.S. 191 (1979); *see also Darrin v. Gould,* 85 Wn.2d 859, 877, 540 P.2d 882 (1975). This absolute mandate of equality does not, however, bar affirmative governmental efforts to create equality in fact; governmental actions favoring one sex which are intended solely to ameliorate the effects of past discrimination do not implicate the Equal Rights Amendment. *Southwest Wash. Chapter, Nat'l Elec. Contractors Ass'n v. Pierce Cy.,* 100 Wn.2d 109, 667 P.2d 1092 (1983).

■ Neither party disputes the intercollegiate athletics program at Washington State University is subject to the Equal Rights Amendment and the Law Against Discrimination. The trial court found the operation of the program resulted in discriminatory treatment of women and the women's athletic program in violation of these laws. Football is a large and essential part of intercollegiate athletics at the University. To exclude football, an all male program, from the scope of the Equal Rights Amendment would only serve to perpetuate the discriminatory policies and diminished opportunities for women.

The trial court attempted to explain the exclusion of football by stating football was a sport "unique in many respects, the combination of which distinguished it from all other collegiate sports . . ." The court identified such dis-

tinguishing characteristics as the number of participants, scholarships, and coaches, amount of equipment and facilities, income generated, media interest, spectator attendance, and publicity generated, for the University as a whole. The court concluded:

> Because of the unique function performed by football, it should not be compared to any other sport at the University.

> Because football is operated for profit under business principles, . . . football should not be included in determining whether sex equity exists . . .

We do not believe, however, these or any other characteristics of football justify its exclusion from the scope of the injunction remedying violations of the Equal Rights Amendment. It is stating the obvious to observe the Equal Rights Amendment contains no exception for football. *See Darrin v. Gould, supra.* The exclusion of football would prevent sex equity from ever being achieved since men would always be guaranteed many more participation opportunities than women, despite any efforts by the teams, the sex equity committee, or the program to promote women's athletics under the injunction.

## B
### Revenue Retention

The plaintiffs also challenge the portion of the injunction excluding from the division of university financial support the revenue generated by any specific sport or program. The injunction allows each sport to reap the benefit of the revenues it generates. We hold the trial court did not abuse its discretion. Exclusion of sports–generated revenue from the calculations of university financial support is not prohibited under applicable state law and can be supported by several policy considerations. We affirm this portion of the trial court's injunction.

The plaintiffs cite no law or authority which would have required the trial court to include sports–generated revenues in its calculations. They cite RCW 28B.10.704 as an indication of legislative support for their position. RCW

28B.10.704 provides in relevant part:

> Funds used for purposes of providing scholarships or other forms of financial assistance to students in return for participation in intercollegiate athletics . . . shall include but not be limited to moneys received as contributed or donated funds, or revenues derived from athletic events, including gate receipts and revenues obtained from the licensing of radio and television broadcasts.

The plaintiffs contend this statute indicates a legislative intent to pool sports–generated revenues to make them available for athletic scholarships.

██ The legislative history does not support reading such intent into this provision. The statute, Laws of 1971, 1st Ex. Sess., ch. 28, was enacted following a request for an attorney general opinion regarding the constitutionality of using sports–generated revenues for athletic scholarships. The Attorney General had indicated the revenues were state funds and were subject to the provisions of article 8, section 5 of the constitution, regarding gifts of state funds. After the statute was enacted, the Attorney General concluded the statute acted to place such athletic scholarships outside of the boundaries of constitutionally prohibited gifts. See Attorney General Informal Opinion to M. A. Allan, President, Highline Community College, at 7–9 (August 23, 1971); see also Memorandum from Richard Hemstad, Legal Assistant, Office of the Governor, to Governor Daniel J. Evans (April 13, 1971).

The legislative history supports the contention sports–generated revenues are in fact state funds. We believe it does not, however, support the plaintiffs' assertion this statute should be used to prohibit the trial court's decision, nor is plaintiffs' assertion a necessary inference from the language of the statute. The trial court chose an injunctive remedy neither required nor prohibited by applicable law and acted within its discretion in choosing to create a funding plan allowing each sport to benefit from the revenues it generates.

The trial court's funding plan provides incentive for all

sports to develop revenue–generating capability of their own. As the trial court stated in its findings of fact and conclusions of law:

> There is an incentive to coaches and to a lesser extent their athletes to produce as much income as possible from all sources because they are the persons who first benefit from such income.

The funding plan encourages the sports to fund their expenses through their own efforts, rather than depend upon direct legislative appropriations.

The injunction specifically requires the sex equity committee to recommend ways to encourage and promote women's sports to increase their own revenues; the funding plan would further promote such a goal. The plan thus requires the University to create equal opportunity to raise revenue for men's and women's sports.

The funding plan allows disproportionate expenses of any particular sports program to be derived from the program itself. The plan is also gender neutral. It provides a solution which does not violate the Equal Rights Amendment and encourages revenue development for all sports while accommodating the needs of the sports programs incurring the greatest expenses at this time.

Our decision upholding the trial court's conclusion regarding sports–generated revenues does not in any way modify the University's obligation to achieve sex equity under the Equal Rights Amendment. The trial court's minimum requirements for participation opportunities and scholarships, already discussed, must be achieved; the court's guidelines for distribution of nonrevenue funds must be followed, and the remaining portions of the injunction, including promotion and development of women's sports, must be observed.

In addition, our conclusion allowing each sport to use the revenues it generates does not, of course, require the sport to do so. The record reflects the football program was transferring $150,000 or more per year from its revenues to the women's program before the injunction was entered.

We encourage such practices to continue, along with other efforts to foster cooperation within the department.

We therefore reverse the trial court's exclusion of football from its calculations for participation opportunities and scholarships and affirm the trial court's decision to exclude sports–generated revenues from its distribution of financial support. We emphasize the portion of the injunction requiring additional promotion of women's sports and development of their revenue–generating capability and encourage continued cooperation and efforts to bring the University's intercollegiate athletic program into compliance with the Equal Rights Amendment.

## II

The plaintiffs argue the trial court erred in reducing the attorney fee award based on the court's assumption that a lack of efficiency and duplication of efforts are inevitable when public interest attorneys are employed. The University argues the trial court did not reduce the plaintiffs' attorney fee award based on their public interest representation. The findings of fact and memorandum opinion for attorney fees and costs, however, reveal the trial court did consider the plaintiffs' public interest representation in computing the fee award. In its findings of fact and conclusions of law the trial court stated:

> A lack of efficiency and duplication of effort are inevitable when attorneys are employed by a public service law firm which operates on a non–profit basis without the safeguards built into a practice of law for profit.
>
> . . .
>
> In determining the hours reasonably and justifiably expended by plaintiffs' attorneys and the reasonableness of hourly rates at which the performance of such services should be compensated, the Court has considered the following factors:
>
> . . .
>
> (6) The fact that some of the plaintiffs' attorneys . . . performed services voluntarily, and some performed services without an agreement in advance as to what, if anything, they would be paid.

RCW 49.60.030(2) provides for the recovery by a plaintiff in a discrimination action of "the cost of suit including a reasonable attorney's fees or any other remedy authorized by this chapter or the United States Civil Rights Act of 1964 . . ." This remedy provision is to be construed liberally in order to encourage private enforcement of the Law Against Discrimination. RCW 49.60.020.

A trial court may consider a variety of factors when determining a reasonable attorney fee award, including the level of skill required by litigation, the time limitations imposed, the amount of potential recovery, the attorney's reputation, and the undesirability of the case. *Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 597, 675 P.2d 193 (1983). In *Bowers,* this court held the trial court erred in adjusting the fee award to reflect the quality of the attorneys' work. *Bowers,* at 601. A reviewing court may remand a trial court's attorney fee award for reconsideration when it applies erroneous standards. *Bowers,* at 601; *Key v. Cascade Packing, Inc.,* 19 Wn. App. 579, 576 P.2d 929 (1978).

■ This court has also held a trial court cannot deny an award of attorney fees simply because the party is represented by a public interest group. *Fahn v. Cowlitz Cy.,* 95 Wn.2d 679, 685, 628 P.2d 813 (1981). The present issue of whether a court may reduce the award for the same reasons is one of first impression in Washington. The applicable statute, RCW 49.60.030(2), makes no mention of a reduction in attorney fees because of public service representation. Thus, we look to federal authority for guidance in resolving this question. RCW 49.60.030(2); *Fahn v. Cowlitz Cy., supra.*

The United States Supreme Court has stated reasonable fees in a federal civil rights action are to be calculated by prevailing market rates regardless of whether the attorney is a private or nonprivate counsel. *Blum v. Stenson,* 465 U.S. 886, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984). The plaintiff in *Blum* was represented by the Legal Aid Society of New York in a civil rights action. The Supreme Court

rejected the defendant's argument to base fees on the actual cost to the attorney and also rejected an amicus argument calling for an adjustment to the fees because the operating expenses of nonprofit legal services organizations may be lower. *Blum,* at 893. The Court added that a court must avoid decreasing reasonable fees just because the attorney is pro bono publico rather than an attorney attempting to secure profit. *See also Gautreaux v. Chicago Housing Auth.,* 690 F.2d 601, 613 (7th Cir. 1982) ("[t]he notion that fee awards should be reduced where they are to be paid to not–for–profit organizations has been rejected by every court of appeals to consider it"), *cert. denied,* 461 U.S. 961 (1983).

The trial court abused its discretion in even considering the plaintiffs' public interest representation. Although the court has discretion to reduce the award to the extent the amount sought is due to inefficiency or duplicative efforts, any reduction based simply on the public interest representation of the athletes was error. We reverse the trial court on this issue and remand the case with instructions to ignore the nonprofit status of plaintiffs' counsel in determining a reasonable fee award.

The University, in its cross appeal, argues the attorney fee award for the plaintiffs should be reduced by the percentage of the University's success. The trial court found the plaintiffs were the prevailing parties and awarded them attorney fees, although the University prevailed on a number of issues. The trial court considered the extent to which the plaintiffs prevailed but found the issues and evidence so interrelated as to make a division based on successful and unsuccessful claims impossible without being arbitrary.

In Washington, the prevailing party is the one who receives judgment in that party's favor. *Andersen v. Gold Seal Vineyards, Inc.,* 81 Wn.2d 863, 505 P.2d 790 (1973); *Moritzky v. Heberlein,* 40 Wn. App. 181, 697 P.2d 1023 (1985). Washington law is clear on which party prevails when money damages are involved, but Washington courts have never considered the issue where each side prevails on

different points in a discrimination action. Although RCW 49.60.030(2) does not specifically limit the award of fees and costs to the prevailing party, a contrary reading would lead to fee awards to all persons claiming to be victims regardless of the outcome of the lawsuit. As discussed previously, this court may look to federal authority when construing the remedies under RCW 49.60. *Fahn v. Cowlitz Cy., supra.*

■ The United States Supreme Court has held the extent of the plaintiff's success is a crucial factor in determining the proper amount of attorney fees under a civil rights action. *Hensley v. Eckerhart,* 461 U.S. 424, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983). The Court held a party prevails when it succeeds on any significant issue which achieves some benefit the party sought in bringing suit. *Hensley,* at 433. If the claims are unrelated, however, the court should award only the fees reasonably attributable to the recovery.

In this case, although no express reference to *Hensley* was made, the trial court apparently applied the same rationale. The court found the plaintiffs had prevailed on many significant issues, and the evidence presented and attorney fees incurred for the successful and unsuccessful claims were inseparable. After reviewing the record, we agree. The trial court did not abuse its discretion in determining the plaintiffs were the prevailing parties and entitled to all fees awarded.

## III

The University argues the trial court erred in awarding the plaintiffs certain costs, including those for travel, copying, telephone, and depositions. The University contends RCW 4.84.010 limits recoverable costs to those defined in the statute. The statute lists costs recoverable by the prevailing party "in addition to costs otherwise authorized by law . . ." RCW 4.84.010. Pursuant to RCW 49.60.030(2), an aggrieved party is entitled to the costs of the suit and any other remedy authorized by the United States Civil Rights

Act. Thus, RCW 4.84.010 does not limit the recoverable costs in a discrimination action under RCW 49.60. Because this court has not previously decided the scope of costs under RCW 49.60, we look to federal authority for direction. *Fahn v. Cowlitz Cy.,* 95 Wn.2d 679, 628 P.2d 813 (1981); *Davis v. Department of Labor & Indus.,* 94 Wn.2d 119, 615 P.2d 1279 (1980).

Federal courts award a variety of costs in civil rights litigation that are normally not awarded in other types of litigation. *Dowdell v. Apopka, Fla.,* 698 F.2d 1181 (11th Cir. 1983). The court in *Dowdell* held the recoverability of costs is determined by what is reasonable and necessary in the preparation and trial of the case. *Dowdell,* at 1190–91. The court added that even relatively large or unusual costs may be recovered when reasonably incurred. *Dowdell v. Apopka, Fla., supra.* The court found this to be especially true in public interest litigation where an attorney often donates legal talent.

We recognize other decisions of this court which have narrowly defined the term "costs of suit" in other contexts. *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 66, 738 P.2d 665 (1987); *Nordstrom, Inc. v. Tampourlos,* 107 Wn.2d 735, 743, 733 P.2d 208 (1987). In this case, however, we adopt the federal rule allowing more liberal recovery of costs by the prevailing party in civil rights litigation, in order to further the policies underlying these civil rights statutes: to make it financially feasible to litigate civil rights violations, to enable vigorous enforcement of modern civil rights legislation while at the same time limiting the growth of the enforcement bureaucracy, to compensate fully attorneys whose service has benefited the public interest, and to encourage them to accept these cases where the litigants are often poor and the judicial remedies are often nonmonetary. *Dowdell,* at 1189–91. The great weight of authority allows a prevailing civil rights plaintiff to recover reasonable expenses incurred. *See Daly v. Hill,* 790 F.2d 1071, 1084 (4th Cir. 1986) (and cases cited therein). *See also Palmigiano v. Garrahy,* 707 F.2d 636 (1st Cir.

1983) (reasonable and necessary costs include out–of–pocket expenses for transportation, lodging, parking, food and telephone expenses); *Northcross v. Board of Educ.,* 611 F.2d 624 (6th Cir. 1979) (costs for civil rights actions include reasonable photocopying, paralegal expenses, travel and telephone), *cert. denied,* 447 U.S. 911 (1980); *Abrams v. Baylor College of Medicine,* 581 F. Supp. 1570 (S.D. Tex. 1984); *Easley v. Anheuser–Busch, Inc.,* 572 F. Supp. 402 (E.D. Mo. 1983), *rev'd in part on other grounds,* 758 F.2d 252 (8th Cir. 1985); *Greenspan v. Automobile Club,* 536 F. Supp. 411 (E.D. Mich. 1982) (statistician and computer expenses, photocopying, long distance telephone, supplies, equipment, depositions); *Vulcan Soc'y of Westchester Cy., Inc. v. Fire Dep't,* 533 F. Supp. 1054, 1067 (S.D.N.Y. 1982).

The trial court found all but two of the awarded costs were reasonable and necessary expenditures in the preparation and trial of the case. Given our reliance upon federal law to determine the propriety of such awarded costs, we find the trial court did not abuse its discretion in awarding these challenged costs.

## IV

The University also appeals the trial court's award of costs to the athletes' expert witnesses, claiming the fees were contingent and thereby invalid under CPR DR 7–109(C). CPR DR 7–109(C), however, states

a lawyer may advance, guarantee, or acquiesce in the payment of:

. . .

(3) A reasonable fee for the professional services of an expert witness.

This provides some flexibility in the payment of expert witnesses.

In addition, although not in effect at the time of the trial, the new Rules of Professional Conduct do not prohibit the fee award for the athletes' expert witnesses. Rather, RPC 3.4(b) states an attorney shall not offer an inducement to a witness that is prohibited by law. RPC 1.8(e) allows an

attorney to advance or guarantee costs, including costs of obtaining evidence, provided the client remains ultimately liable for such expenses. This is consistent with a flexible payment system, as long as the calculation of the final amount is not determined by the amount of recovery.

A federal court of appeal, applying New York DR 7–109(C) to a similar claim of contingent expert witness fees, held an expert's likely forbearance of a fee, should the lawsuit fail, did not constitute a contingency fee. *Seigal v. Merrick,* 619 F.2d 160 (2d Cir. 1980). The *Seigal* court held voluntary forbearance of fees was one of several established methods of mitigating hardships.

■ The athletes' fee arrangement with the expert witnesses in this case was based primarily on lack of funds. The expert witnesses were willing to defer temporarily their compensation as a voluntary contribution to the lawsuit, but the University's claim that the fees were contingent is not supported by the record. The experts ultimately expected to be paid. The use of deferred payment plans for expert witnesses is supported by the policy of RCW 49.60-.030, which encourages good faith litigation, and may improve courtroom access to civil rights litigants who cannot initially afford expert witness fees. As long as the litigant remains ultimately liable, we believe expert witnesses may temporarily forbear payment of their fees in an action under RCW 49.60.

## V

The trial court ruled discrimination is a tort and that RCW 4.92.110 required the plaintiffs to file a tort claim with the State before bringing suit. The plaintiffs originally filed suit October 26, 1979; they filed a tort claim about September 11, 1980. The parties stipulated that if RCW 4.92.110 controls, the complaint would be considered filed as of September 12, 1980. The trial court ruling therefore eliminated about 1 year's worth of damages. The plaintiffs contend the trial court erred in holding RCW 4.92.110 required them to file a tort claim as a condition precedent

to bringing suit under RCW 49.60.

RCW 4.92.110 provides:

No action shall be commenced against the state for damages arising out of tortious conduct until a claim has first been presented to and filed with the director of financial management. The requirements of this section shall not affect the applicable period of limitations within which an action must be commenced, but such period shall begin and shall continue to run as if no claim were required.

■■ This court has characterized a discrimination action as a tort. *Anderson v. Pantages Theatre Co.,* 114 Wash. 24, 194 P. 813 (1921). Textual analysis, therefore, supports the trial court's application of the RCW 4.92.110 "tortious conduct" to this discrimination action. *See* 2A C. Sands, *Statutory Construction* § 46.01 (4th rev. ed. 1984).

The legislative histories of the statutes provide no additional support for the plaintiffs' contention that discrimination actions are exempt from the requirements of RCW 4.92.110. The Law Against Discrimination enacted in 1949 did not specifically waive the State's sovereign immunity to suit in court, but instead established a state agency to process discrimination claims. *See* Laws of 1949, ch. 183. RCW 4.92.110 opened the state courts to tort suits, provided its procedural requirements are followed. There is no indication of legislative intent to exempt discrimination actions from the requirements of RCW 4.92.110.

An analysis of the underlying purposes and objects of these statutes demonstrates they can be construed together. *See* 2A C. Sands § 51.03. The purpose of RCW 4.92.110 is to notify the State of pending tort actions before Washington courts. The purpose of RCW 49.60 is to remedy discrimination. The plaintiffs argue the statutes conflict and the special statute, the Law Against Discrimination, should control over the general statute, RCW 4.92.110. *See Sim v. State Parks & Rec. Comm'n,* 90 Wn.2d 378, 583 P.2d 1193 (1978); *State Bd. Against Discrimination v. Board of Directors,* 68 Wn.2d 262, 412 P.2d 769 (1966) (specific pro-

vision of law against discrimination denying school district the ability to appeal Board's decision controls over administrative procedure act).

This court has held it will give effect to two allegedly conflicting statutes wherever possible. *Gold Bar Citizens for Good Gov't v. Whalen,* 99 Wn.2d 724, 728, 665 P.2d 393 (1983). The present case is distinguishable from *State Bd. Against Discrimination v. Board of Directors, supra.* In that case, two procedural provisions directly conflicted; in this case, RCW 4.92.110 provides a procedural requirement while the Law Against Discrimination provides none.

The plaintiffs are correct in noting this court has entertained several discrimination cases without imposing the filing requirement of RCW 4.92.110. Nevertheless, we are persuaded RCW 4.92 and the Law Against Discrimination do not conflict and this court should fulfill the purposes of both. We therefore affirm the trial court's application of RCW 4.92.110 to the plaintiffs' discrimination claim.

To summarize, the injunctive relief provided it by the trial court is affirmed as modified in this opinion. The football program may not be excluded from the calculations of participation opportunities, scholarships, or distribution of nonrevenue funds. The reduction of attorney fees is reversed, while the trial court ruling that plaintiffs must file a claim under RCW 4.92.110 as a condition precedent to bring this suit is affirmed. Pursuant to RAP 18.1, the plaintiffs' request for attorney fees and expenses on appeal is granted for an amount to be determined on remand. The issues raised by the University in its cross appeal are affirmed. The entire matter is remanded to the Superior Court to be under its continuing jurisdiction with instructions to take whatever further action is necessary consistent with this opinion.

PEARSON, C.J., and UTTER, BRACHTENBACH, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

DORE, J. (dissenting)—The majority bases its decision on

the scope of costs on the language of RCW 49.60.030(2). This statute provides, in part, that:

> Any person deeming himself injured . . . shall have a civil action . . . to recover the actual damages sustained by him . . . together with the cost of suit including a reasonable attorney's fees . . .

Since the scope of "the cost of suit" has not been defined prior to this suit, the majority looks to federal law for precedence. It does so because this is a civil rights case and this court has previously looked to federal law to help interpret the state civil rights law provisions of RCW 49.60. *See, e.g., Fahn v. Cowlitz Cy.*, 95 Wn.2d 679, 628 P.2d 813 (1981).

The error the majority commits, however, is that we have defined "the costs of suit" in another context. RCW 19.86, the Consumer Protection Act, provides that an injured party may

> recover the actual damages sustained by him . . . together with the costs of the suit, including a reasonable attorney's fee . . .

RCW 19.86.090. In *Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 743, 733 P.2d 208 (1987), this court specifically held that "costs" recoverable under the attorney fees section of the Consumer Protection Act were those narrowly defined in RCW 4.84.010.

The majority's rationale that civil rights litigants deserve greater recovery than other classes of litigants, and therefore deserve to recover greater "costs" is unjustifiable. A Consumer Protection Act plaintiff may also be suing for a remedy which is nonmonetary, and also may be enforcing rights which our Legislature has deemed of great public import. A trade secrets plaintiff may also only receive an injunction without a monetary award of damages in order to enforce his or her rights. This court has already declared that those plaintiffs should not receive a much increased award by a liberal use of the costs provision, and I see little reason why a civil rights claimant should receive this additional—and I believe, unjustifiable—benefit.

Costs other than those defined in RCW 4.84.010 normally account for a percentage of the attorney's hourly rate. To allow the attorney recovery of his reasonable attorney fee, and then to add an expanded costs bill, allows the attorney an unjust windfall.

I would not allow this result to occur. I therefore dissent.

Reconsideration denied October 27, 1987.