[No. 42273-1-I. Division One. June 22, 1998.]

KAREN J. ATWOOD, ET AL., *Respondents*, v. BERN SHANKS, as *Director of the Department of Fish and Wildlife*, ET AL., *Petitioners*.

---

[34]*Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

*Christine O. Gregoire, Attorney General,* and *Jay D. Geck* and *Matthew A. Love,* for petitioners.

*Joseph N. Barcott* of *Barcott & Christopherson,* for respondents.

COLEMAN, J. — The Washington State Department of Fish and Wildlife, its director Bern Shanks, the Washington State Fish and Wildlife Commission, and its commissioners (petitioners) seek the dissolution of a temporary injunction prohibiting the enforcement of a recent gear regulation for Puget Sound gill-net fishers. In an attempt to reduce the incidental bycatch of diving seabirds, the regulation requires the use of visible twine in the top portion of gill nets in certain sockeye and pink salmon fisheries.

The Superior Court enjoined selective enforcement of the regulation against nontreaty fishers. The court agreed with the respondents, a large number of nontreaty Puget Sound commercial salmon fishers, who claimed that the regulation violated their right to a fair share of the fishery and that selective enforcement against nontreaty fishers violated their federal and state constitutional rights of equal protection.

We dissolve the injunction because nontreaty gill net fishers do not have an absolute right to a certain percentage of the fishery. Instead, they are subject to legitimate state regulation. In addition, it is well-settled law that nontreaty and treaty fishers are not similarly situated with respect to fishing rights and therefore equal protection principles do not apply.

## FACTS

On May 30, 1997, the Washington Fish and Wildlife Commission adopted a regulation that requires the use of visible twine for the first 20 meshes of gill nets used in areas 7 or 7A sockeye or pink salmon fisheries.[1] WAC 220-47--302(5).[2] The purpose of the rule is to protect diving seabirds from becoming entangled and drowning in the nets. The Commission allowed a year between adoption of the new regulation and its implementation to allow the affected fishers ample time to modify their gear.

At the end of August 1997, a group of commercial salmon fishers filed suit claiming that the Department of Fish and Wildlife had repeatedly failed to adequately manage the salmon fishery and that the State had violated their right

---

[1] In general, catch reporting area 7 covers the waters surrounding the San Juan Islands and area 7A covers the waters between the San Juan Islands and the mainland Canadian border. For a detailed textual description of the areas see WAC 220-22-030(8), (9).

[2] Subsection 5 is an entirely new subsection which states: "It shall be unlawful to take or fish for salmon with gill net gear beginning in 1998 in Areas 7 or 7A sockeye or pink fisheries unless said gill net gear is constructed so that the first 20 meshes below the corkline are composed of five-inch mesh white opaque minimum 210d/30 (#12) diameter nylon twine." WAC 220-47-302(5).

to take a fair share of the available harvestable salmon as well as their constitutional rights of equal protection. Even though the original complaint identified other subsections of WAC 220-47-302, the plaintiffs did not specifically take issue with WAC 220-47-302(5) until January 14, 1998. It was at that time that the gill-netters moved for a temporary injunction staying the selective enforcement of the rule against nontreaty fishers. The plaintiffs did not attack the validity of the rule itself, but rather claimed that selective enforcement would deprive them of their right to share in the salmon fishery and violate their constitutional rights to equal protection.

The Superior Court granted a temporary injunction on February 11, 1998, which enjoined the State from "enforcing WAC 220-47-302(5) until such time as the regulation is actually applied and actually enforced, equally, against anyone who fishes for sockeye or pink salmon with gill net gear." The petitioners appealed the temporary injunction and requested discretionary review. Discretionary review was granted on May 1, 1998, by written order based in part on a finding that the trial court committed probable error.[3] Oral argument on the merits was accelerated as the regulation was originally set to take effect for the 1998 fishing season.

## DISCUSSION

Standard of Review:

■ This court reviews injunctions for abuse of discretion. *Blair v. Washington State Univ.*, 108 Wn.2d 558, 564, 740 P.2d 1379 (1987) (citing *State ex. rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)). We recognize that the trial court has broad discretion to fashion an injunction that is appropriate to the facts, circumstances, and equities before it, *Brown v. Voss*, 105 Wn.2d 366, 372, 715 P.2d 514 (1986), and that reviewing courts give great weight to a

---

[3]The respondents' motion to modify the grant of discretionary review is denied.

trial court's exercise of discretion. *Id.* at 372. However, a trial court abuses its discretion when its decision is arbitrary, manifestly unreasonable, or based upon untenable grounds. *Junker,* 79 Wn.2d at 26. A trial court necessarily abuses its discretion if its ruling is based on an erroneous view of the law. *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.,* 122 Wn.2d 299, 339, 858 P.2d 1054 (1993) (citing *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)).

■ The prerequisites for obtaining injunctive relief are the existence of a clear legal or equitable right, a well-grounded fear of immediate invasion of that right, and a showing that the acts to be enjoined are or will result in actual and substantial injury to the plaintiff. *Tyler Pipe Indus., Inc. v. Department of Revenue,* 96 Wn.2d 785, 792, 638 P.2d 1213 (1982) (quoting *Port of Seattle v. International Longshoreman's & Warehousemen's Union,* 52 Wn.2d 317, 324 P.2d 1099 (1958)). The Superior Court followed these criteria and based the granting of the injunction on a finding that nontreaty gill-netters had clear legal and equitable rights to a fair share of the fishery and to equal protection regarding enforcement of the rule on treaty gill-netters. The court also found that the regulation posed an immediate invasion of the gill-netters' rights because it would be in effect for the 1998 fishing season. Finally, the court relied on affidavits filed by the gill-netters to find that the regulation would result in actual and substantial damage.

■ Both parties agree that this case rises and falls on whether the gill-netters have a clear legal or equitable right in the equal enforcement of commercial fishing regulations against tribal and nontribal fishers or whether nontreaty gill-netters have a treaty right to a fairly apportioned share of available fish. Injunctions are not to be issued in a doubtful case; instead, the court is to examine the likelihood that the moving party will prevail on the merits. *Washington Fed'n of State Employees Council 28 v. State,* 99 Wn.2d 878, 887, 665 P.2d 1337 (1983).

 In ruling on a request for a preliminary injunction that involves purely legal issues the trial court and reviewing court must reach the merits of the purely legal issues. *Rabon v. City of Seattle*, 135 Wn.2d 278, 286, 957 P.2d 621 (1998). While reaching the merits of the legal issues, the court is not to adjudicate the ultimate merits of the case. *Id.* at 286. The injunction in this case was granted based on the pure legal issues of whether nontreaty and treaty gill-netters are entitled to equal protection and whether nontreaty gill-netters have a treaty right to a fair share of the fishery. We therefore address the merits of these issues in determining the likelihood of the nontreaty gill-netters prevailing at trial.

Equal Protection:

An underlying assumption of this appeal, to which there is no dispute, is that the State will selectively enforce the regulation against nontribal fishers. Indeed it is the unilateral application of this regulation to nontreaty gill-netters that is the basis for the injunction. Thus, this dispute over the selective enforcement of WAC 220-47-302(5) appears to be an attempt to reopen the often litigated issue of tribal and nontribal fishing rights.

In material filed after the commissioner's ruling, the respondents repeatedly attempt to distance themselves from an equal protection basis for supporting the temporary injunction. Yet, the Superior Court's order and the respondents' original motion for the injunction implicate equal protection jurisprudence. Indeed, the respondents stated at oral argument that they would not dispute the application of the rule if treaty Indians were subject to the same regulation. This is an equal protection argument.

As part of the treaties entered into between local Indian tribes and the United States in the mid-1850s, the tribes retained ''[t]he right of taking fish, at all usual and accustomed grounds and stations, . . . in common with all citizens of the Territory[.]'' *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658,

674, 99 S. Ct. 3055, 3069, 61 L. Ed. 2d 823 (1979) (quoting article III of the Treaty of Medicine Creek, Dec. 26, 1854, 10 STAT. 1132, at 1133). This clause was interpreted by Judge Boldt to give treaty Indians an equal share in the available fisheries. *See United States v. Washington*, 384 F. Supp. 312, 343 (W.D. Wash. 1974). In addition, Judge Boldt limited the state's regulatory power over Indian off-reservation fishing to issues essential to conservation of the fishery. *Id.* at 342.

 Washington state agencies responded to Judge Boldt's ruling by implementing regulations that were consistent with his order. Washington commercial fishing groups then sued on a theory that nontreaty fishers' equal protection rights were violated when they were subject to regulations that treaty fishers were not. *See Fishing Vessel*, 443 U.S. at 669-74. The issue eventually ended up before the United States Supreme Court, where the Court soundly rejected the equal protection theory by stating that "these treaties confer enforceable special benefits on signatory Indian tribes" and that treaty fishers therefore comprise a distinct class with respect to equal protection analysis. *Id.* at 673, n. 20.

United States Supreme Court precedent cannot be clearer in holding that treaty and nontreaty fishers are not similarly situated for purposes of the State's regulation of fishing activities. *Id.* at 669-74. The State's right to regulate treaty fishing is "strictly limited to specific measures which before becoming effective have been established by the state, either to the satisfaction of all affected tribes or upon hearing by or under direction of [the federal court], to be reasonable and necessary to prevent demonstrable harm to the actual conservation of fish." *United States v. Washington*, 384 F. Supp. at 342.

The respondents' attempt to frame the issue as a seabird conservation regulation instead of a fishing regulation does not alter the legal analysis. In fact, framing the issue as a seabird conservation regulation makes it clear that the petitioners cannot enforce the regulation against treaty

fishers. First, regardless of the purpose of the regulation, WAC 220-47-302(5) is a fishing regulation because it mandates the use of a particular type of gear in a particular fishery. Next, there is no dispute that the regulation is not intended to conserve the salmon fishery because all parties agree that the purpose is to reduce the incidental bycatch of diving seabirds. Thus, because WAC 220-47--302(5) is a fishing regulation that is not necessary to prevent demonstrable harm to the fishery itself, the regulation is invalid and unenforceable against treaty fishers. *See United States v. Washington*, 384 F. Supp at 342 (stating that no state regulation applied to off-reservation treaty fishing can be valid or enforceable until it has been shown reasonable and necessary to the conservation of the fishery); *see also State v. Courville*, 36 Wn. App. 615, 619, 676 P.2d 1011 (1983) (stating that treaty rights of an Indian tribe prohibited the State from enforcing a shellfish harvesting regulation against enrolled members of the tribe while fishing at their usual and accustomed off-reservation fishing grounds because the State made no showing, nor did it contend, that the disputed regulation was reasonable and necessary for conservation).

The Superior Court, insofar as it relied upon an equal protection basis in granting the injunction, abused its discretion by relying on untenable grounds. The gill-netters as nontreaty fishers do not have a clear legal right to equal protection with treaty fishers with respect to fishery regulations that do not pertain to fishery conservation.

*Treaty right to a share in the fishery:*

The Superior Court, in identifying the legal rights of the gill-netters, stated that gill-netters as a class of fishers "have a right to fish just like every other citizen whether it be purse seiners or sport fisher[s] or whatever." The gill-netters contend that *Fishing Vessel* supports the Superior Court by stating that both tribal and nontribal commercial fishers "have a right, secured by treaty, to take a fair share of the available fish." *Fishing Vessel*, 443 U.S. at 684-85. The gill-netters' reliance on *Fishing Vessel* is misplaced.

*Fishing Vessel* speaks only of the general distinction between treaty and nontreaty fishers. It does not limit its application to commercial fishers nor does it address the issue of how the tribes or the State will allocate their share of the fishery.

■■ The State, as trustee for the common resources of the state, has the authority to allocate the resource amongst the various nontreaty participants. Thus, the gill-netters, as one segment of commercial fishers, are subject to State allocation of the nontreaty share among all nontreaty commercial and sport fishers.

The gill-netters claim that they do not dispute the right of the State to regulate fishing but do dispute the limit of the State's right. Again, the gill-netters cite *Fishing Vessel* to support their assertion that there is a limit to the State's regulatory role over nontribal fishers. According to the gill-netters, the Supreme Court has held "that neither party to the treaties may rely on the State's regulatory powers . . . to defeat the other's right to a 'fairly apportioned' share of each covered run of harvestable anadromous fish." *Fishing Vessel*, 443 U.S. at 682. Here again, the gill-netters erroneously rely on precedent that speaks to the necessity of an equal allocation between the State and tribes, to apply to an individual method of nontribal fishing.

Contrary to the Superior Court's characterization, the gill-netters' right is best described as the right to fish according to properly promulgated state regulations. *See Puget Sound Gillnetters v. Moos*, 92 Wn.2d 939, 947-48, 603 P.2d 819 (1979) (stating that "nontreaty fishermen do not have a 'vested' or 'natural' property *right* to fish" and signatory tribes have a treaty right "that nontreaty fishermen do not enjoy."); *Puget Sound Gillnetters Ass'n v. Unites States Dist. Court*, 573 F.2d 1123, 1132 (9th Cir. 1978) (stating that nontreaty fishers' rights are "purely derivative of the state's power to regulate rights in the fish") (*subsequent history omitted*). In addition, the gillnetters have expressly stated that they do not challenge the validity of the regulation. CP 35. Accordingly, we find that the

Superior Court erred in finding that the regulation violated the gill-netters' clear legal or equitable right to a "fair share of the fishery" because no individual segment of non-treaty fishers (or treaty fishers for that matter) have a right to a specific share of the fishery. Rather the competing fishery interests are subject to regulation and allocation by the appropriate governing body.

Dissolving the Injunction:

The gill-netters ask that we postpone the dissolving of the injunction until the 1999 fishing season. The gill-netters allege that it will be impossible for them to comply with the regulation because of the rapidly approaching 1998 salmon fishing season and the logistics of obtaining the necessary supplies and modifying their gear. However, the regulation was passed in May 1997. The State provided the gill-netters more than a year before the new net provisions would be enforced. The gill-netters did not contest the validity of the rule but waited until January 1998 to move for an injunction. In addition, the commissioner's May 1, 1998 order put the gill-netters on notice that the Superior Court committed probable error in granting the injunction. We are not persuaded that the above facts are an appropriate basis for the court to mandate a delay in the application of the WAC 22-22-030(5).

In sum, we find that the Superior Court erred in finding that the respondents had a clear legal right to expect that treaty gill-netters would be subject to the same regulations as nontreaty gill-netters. Due to clear legal precedent, there was little likelihood that the moving party would prevail on the merits.

The Superior Court's temporary injunction is dissolved.

KENNEDY, C.J., and GROSSE, J., concur.

Review denied at 136 Wn.2d 1029 (1998).