[Nos. 24608-9-I; 24702-6-I. Division One. May 28, 1991.]

RONALD PANNELL, ET AL, *Respondents,* v. FOOD SERVICES OF AMERICA, ET AL, *Appellants.*

---

[2]In view of our opinion, it is unnecessary to address Kennedy's other arguments.

*Michael R. Rayton, Thao Tiedt,* and *Ryan, Swanson & Cleveland,* for appellants.

*Pamela A. Okano, Heather Houston, Kathryn L. Feldman, William R. Hickman, Stephen M. Todd,* and *Reed McClure; David E. Breskin* and *Short, Cressman & Burgess,* for respondents.

SCHOLFIELD, J.—Food Services of America, Tradewell Group, Inc., and Thomas Stewart, the defendants in the action below (hereinafter Tradewell), appeal a jury verdict awarding Ronald Pannell, Rodney Adler, Albert Hasson, Ronald Maes, and Robert Miller (hereinafter the Managers), all former Tradewell store managers, damages for their discharge from employment on the basis of age discrimination.

## FACTS

Tradewell, a subsidiary of Pacific Gamble Robinson, employed the plaintiffs as grocery store managers until their discharge in July 1986. Miller–Cascade acquired all of Pacific Gamble Robinson's stock in May 1986. Food Services of America (FSA) is the surviving corporation from a merger between Miller–Cascade and Pacific Gamble Robinson in 1987. Thomas Stewart was an officer of both Miller–Cascade (subsequently FSA) and Tradewell when the Managers were terminated.

At the time of the terminations, Tradewell operated 49 stores, including Tradewell stores, Prairie Market stores and Price Setter stores. On June 16, 1986, Stewart appointed himself Tradewell's president. According to Fred Friedrichsen, zone manager for 19 stores, Stewart stated at that time that he wanted "young, aggressive managers". Stewart then began what he referred to as an "instant reorganization" of Tradewell. He terminated the president, the vice–president, the internal auditor, the director of sales and marketing, and the director of meat operations.

Following this upper management reorganization, Stewart decided to close 12 stores with low profit margins.

He told Jim Dugdale, whom he had recently promoted from retail operations manager to vice–president of operations, to select the 37 best managers, using Stewart's philosophy. Dugdale asked zone managers Randy Fox and Friedrichsen to evaluate the store managers.

Of his 27 managers, Fox rated plaintiff Hasson last. Of the 19 managers he supervised, Friedrichsen rated plaintiffs Maes, Adler, Pannell, and Miller second, third, sixth and tenth, respectively. Dugdale utilized the information solicited from the zone managers, along with Dugdale's own evaluations and comments from other employees, to devise a point scoring system for the 49 managers. According to this scoring system, all five plaintiffs ranked in the bottom 15. Dugdale and Stewart met and determined that 15 instead of 12 managers would be terminated because a number of them had the same score on Dugdale's scoring sheet.

Dugdale met with Fox and Friedrichsen on July 9, 1986, to tell them which stores were to be closed and which store managers would be terminated. Dugdale's explanation for his termination decisions was that he picked those who would not fit into the new regime. The termination list showed that Miller (age 59), Adler (age 49), Hasson (age 53), and Maes (age 49) were in the top five on the list. Dugdale had previously informed Friedrichsen that he was going to terminate Pannell (age 56), but that he was concerned because of Pannell's status as a community leader. In addition, Dugdale mentioned concerns about Miller's health. As for Hasson, despite his low ranking by both Dugdale and Fox, Friedrichsen testified that Hasson ran the most profitable store in the system.

The Managers' evidence indicated that the five terminated managers who brought this suit were some of Tradewell's best managers. Rod Adler, age 49, worked for Tradewell for 26 years. He started as a clerk and was eventually promoted to zone manager, a position he lost when store closures resulted in the loss of one zone manager position. In 1986, Adler was manager of the Auburn Prairie

Market, and was rated the third best manager by his supervisor, Friedrichsen. Adler's store was not slated for closure. The upper management personnel that were terminated in Stewart's reorganization testified as to the high quality of Adler's performance as a store manager. Adler was replaced by 31–year–old Dale Whitson.

Ron Pannell, age 56, began his career at Tradewell in 1953. In 1986, he managed the Shelton[1] Price Setter store. Pannell was awarded the business person of the year award for Mason County in 1977. In 1982, he was voted Citizen of the Year. As a volunteer medic, Pannell established Shelton's only ambulance service, which he and his wife helped fund. This volunteer activity did not interfere with Pannell's job. Pannell did use his community esteem to promote Tradewell's business interests, most significantly by using his influence to enable Tradewell to buy the land for building the new Price Setter in Shelton. Friedrichsen rated Pannell sixth among his 19 managers. Tradewell's former president testified that Pannell was "an excellent store manager." Pannell was replaced by Mark O'Brien, age 35, who had not lived or worked previously in Shelton.

Ron Maes, age 49, had worked for Tradewell for approximately 30 years, 19 of those as a manager, when he was terminated from Tradewell. Apparently, the only criticism he received was that he worked too many hours. Friedrichsen had been Maes' supervisor for 12 years, and rated him second of his 19 managers. Tradewell's former president testified that he believed that Maes was the hardest working manager the company had. Maes was replaced by Curt Thomason, age 43, who ranked 13th on Friedrichsen's list. Maes' brother worked as a clerk for Tradewell, and Dugdale offered to give Maes his brother's position, but Maes declined.

Bob Miller was fired from Tradewell 2 weeks before his 60th birthday and was replaced by a 31–year–old manager. Miller had been a store manager for 30 years. The stores he

---

[1] The transcript says "Chehalis", but other references are to Shelton.

managed were profitable ones. Tradewell's former president testified that Miller was one of the company's best merchandisers and that he was well liked by his customers. Miller's supervisor, Friedrichsen, rated Miller 10th out of 19.

Miller was diagnosed with stomach ulcers, but he had only missed 1 day of work as a result. His doctor did not think that his condition would affect his ability to manage a grocery store. However, at the time of his termination, Miller had been waiting for the results of a stomach biopsy for cancer. No one from Tradewell contacted Miller's doctor to ask about Miller's fitness for his job. The Tradewell documentation regarding Miller's termination indicated that he was dismissed for health reasons.

Albert Hasson was terminated from Tradewell the day before his 54th birthday. He had worked for Tradewell for 25 years, the last 24 as a store manager. During his years at Tradewell, Hasson was continually asked to run larger and larger stores. When he was terminated, Hasson was running the most profitable store in the company. Hasson typically received the highest bonuses offered by Tradewell. Tradewell's former president testified that Hasson was a very dedicated manager who always had good gross profits. However, Fox rated Hasson last of his 27 managers. Hasson was replaced by Paul Kapioski, age 28. Fox told Hasson that Tradewell felt he would not fit into the new regime.

Friedrichsen testified that he could see no legitimate reasons for the termination decisions that were made, and he believed that Stewart's plan was to obtain young, aggressive managers. Friedrichsen testified that the Managers were terminated because of their age, and in Miller's case, because of his age and health. At the time of their terminations, Friedrichsen told Maes, Pannell, and Miller that they were fired because of their ages[2] and repeated a previous

---

[2]*Friedrichsen* apparently told Pannell, "When this is all said and done, I think some of you fellows will have a good discrimination suit, could have a discrimination suit on the company."

comment made by Dugdale—that they would not fit into the new scheme. Friedrichsen told Maes that, at age 50, he, Friedrichsen, would not be with the company long. Friedrichsen was terminated soon after he fired the Managers. The other zone manager, Fox, age 38, was urged to stay with the company.

In 1988, Tradewell decided to divest itself of the grocery store business, and offered its stores for sale. By November 1988, all but two stores were sold, some to Tradewell managers. According to Tradewell, the stores were available for purchase by anyone, but none of the five Managers, plaintiffs in this case, inquired regarding purchase. Tradewell no longer is involved in the retail grocery industry. Its business is devoted to real estate management.

According to the Managers' evidence, in 1988 the stores were offered for sale to their store managers and managers of other stores, who had 2 to 3 weeks to decide upon purchase. Following that time, the stores were openly offered for sale outside the company. Curt Thomason, the manager of the Shelton Price Setter, Pannell's old store, purchased that store and the Skyway Prairie Market that Maes had managed for 19 years. Pannell and Maes both testified that they would have purchased their respective stores, but were never given the opportunity.

Paul Kapioski, manager of the West Seattle store, entered into partnership with Stewart and purchased that store, along with two others. Hasson, who had managed the West Seattle store, testified that he would have purchased the store if given the opportunity.

Adler testified that he would have purchased the three stores purchased by Kapioski if he had been given the opportunity. Miller testified that he would have been very interested in purchasing the Burien store he had managed if he had had the chance.

This lawsuit was originally filed in Mason County, but Stewart requested a change of venue to King County, which was granted. In a pretrial motion, Stewart requested a court ruling that Friedrichsen was not a speaking agent for

Tradewell. The trial court ruled that Friedrichsen was a speaking agent with respect to conveying the fact of termination and the reasons.

In February 1989, a pretrial order was entered in which it was admitted by Stewart that each terminated manager was over 49 years old, was discharged, and was replaced by someone younger. The trial commenced in March 1989, and after 23 days of trial, was submitted to the jury on claims of age discrimination, breach of implied contract, negligent misrepresentation, and with respect to Miller, handicap discrimination. The jury returned five special verdict forms, finding that Tradewell had discriminated against each manager on the basis of age; that FSA had aided and abetted the age discrimination; that Tradewell and FSA were guilty of negligent misrepresentation to each manager; and that Tradewell, aided and abetted by Stewart and FSA, had discriminated against Miller on the basis of handicap. The jury found for the defendants with respect to breach of implied contract.

The trial court sustained the defendants' contentions that the damages awards for negligent misrepresentation were duplicative of those awarded for discrimination. Net judgments against Stewart, Tradewell, and FSA jointly and severally were as follows:

| | |
|---|---|
| Pannell | $293,748 |
| Adler | 351,249 |
| Hasson | 394,711 |
| Maes | 483,803 |
| Miller | 252,988 |

The trial court awarded the Managers their attorney's fees in the amounts of $501,874 through April 25, 1989, $22,169.50 through June 7, 1989, and $5,000 through August 17, 1989. The Managers were also awarded $95,527.80 in litigation costs. This appeal timely followed.

### Assignments of Error

The Managers argue that Tradewell failed in its brief to properly assign error to the judgments pursuant to RAP 10.3(a)(3) and RAP 10.3(g). Tradewell responds that it properly assigned error to the trial court rulings in its notice of appeal and that RAP 10.3 only requires a brief to separately assign error to instructions and findings of fact, not judgments.

RAP 2.4 states in pertinent part:

> **(a) Generally.** The appellate court will, at the instance of appellant, review the decision or parts of the decision designated in the notice of appeal . . ..

RAP 10.3(a) states in pertinent part as follows:

> **Brief of Appellant or Petitioner.** The brief of the appellant or petitioner should contain under appropriate headings and in the order here indicated:
>
> . . . .
>
> (3) *Assignments of Error.* A separate concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error.

RAP 10.3(g) states as follows:

> **Special Provision for Assignments of Error.** A separate assignment of error for each instruction which a party contends was improperly given or refused must be included with reference to each instruction or proposed instruction by number. A separate assignment of error for each finding of fact a party contends was improperly made or refused must be included with reference to the finding or proposed finding by number. The appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto.

An examination of Tradewell's brief indicates that RAP 10.3(a)(3) was complied with. Tradewell is correct in arguing that RAP 10.3(g) requires only that errors concerning instructions and findings of fact must be separately set forth in the brief. In addition, the instant notice of appeal designates the judgment on jury verdict and the order on defendants' motion for judgment notwithstanding the verdict or in the alternative a new trial. It appears that Tradewell has properly complied with the Rules of Appellate Procedure.

ADMISSIONS BY PARTY OPPONENT

Tradewell contends that the statements of Friedrichsen, Fox, and Dugdale were not admissible because the three were not speaking agents for Tradewell. Tradewell further contends none of them were agents of FSA or Stewart, and the jury should have been so instructed.

ER 801(d) states in pertinent part:

**Statements Which Are Not Hearsay.** A statement is not hearsay if—

. . . .

(2) *Admission by Party–Opponent.* The statement is offered against a party and is . . . (iii) a statement by a person authorized by him to make a statement concerning the subject, or (iv) a statement by his agent or servant acting within the scope of his authority to make the statement for the party . . ..

The focus in this case with regard to admissions by party opponent concerns Friedrichsen's testimony and his statements to the Managers about why they were fired. Tegland notes in his treatise that the Washington rule is narrower than its federal counterpart, which states in pertinent part that:

"A statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship."

5B K. Tegland, Wash. Prac. § 349, at 82 n.1 (3d ed. 1989) (quoting Fed. R. Civ. P. 801).

According to Tegland, the Washington rule was meant to restate existing law. In *Kadiak Fisheries Co. v. Murphy Diesel Co.,* 70 Wn.2d 153, 422 P.2d 496 (1967), the Washington State Supreme Court held that the hearsay statement of Kadiak's chief mechanic about the probable cause of an engine fire was not admissible at trial. *Kadiak,* at 162. In its analysis, the *Kadiak* court quoted from the Restatement (Second) of Agency §§ 286, 288 (1958) as follows:

In an action between the principal and a third person, statements of an agent to a third person are admissible in evidence *against* the principal to prove the truth of facts asserted in them as though made by the principal, if the

agent was authorized to make the statement or was authorized to make, on the principal's behalf, any statements concerning the subject matter. § 286.

(1) The general rules concerning the interpretation of authority are applicable in determining whether an agent has authority to make statements concerning operative or other facts.

(2) Authority to do an act or to conduct a transaction does not of itself include authority to make statements concerning the act or transaction.

(3) Authority to make statements of fact does not of itself include authority to make statements admitting liability because of such facts. § 288.

*Kadiak,* at 163. Applying these Restatement sections, the *Kadiak* court stated that there was no evidence that the company's chief mechanic had any authority to make statements about the subject matter of his work or to admit liability. *Kadiak,* at 163.

A Washington postrule case held that an agent's admission is not inadmissible under ER 801(d)(2) solely because the statement is an opinion rather than a factual statement. In *Lockwood v. AC&S, Inc.,* 109 Wn.2d 235, 744 P.2d 605 (1987), an asbestos case, Lockwood sought to introduce three documents written by defendant Raymark's director of environmental affairs, by Raymark officials, and by Raymark's corporate medical director. All three documents concerned the asbestos health issue. *Lockwood,* at 258. *Raymark* argued, *inter alia,* that even if the declarants were speaking agents, the documents were opinions rather than facts, and as such were inadmissible. The *Lockwood* court held that it saw no reason to distinguish between an agent's statement as an opinion and a statement of fact. *Lockwood,* at 263.

With respect to the question of "speaking agent" status, the *Lockwood* court stated as follows:

In light of the declarants' authority to act as health officials for Raymark, it is reasonable to infer that they were authorized to make statements about the subject of asbestos health issues on Raymark's behalf. Therefore, we conclude that the documents were admissions by a party opponent.

*Lockwood,* at 262.

The Managers argue that Friedrichsen's statements were admissible because he was authorized to make statements regarding the subject matter, *i.e,* he was authorized to tell the Managers why they were terminated. The Managers argue further that comment *a* to § 286 notes that if an agent is authorized to make statements on the subject matter, it makes no difference whether the agent's statements are true or whether the agent has some particular motive in making them.

■ Because Friedrichsen was authorized to make statements regarding the subject matter of the Managers' terminations, we hold that the trial court did not err in ruling that his statements regarding the reasons for those terminations, that is, his statements regarding age discrimination, were admissible under ER 801(d)(2).

■ Tradewell also argues that the statements made by Fox and Dugdale regarding the terminations were not admissible because section 287 of the Restatement (Second) of Agency does not recognize as admissions party opponent statements from one agent to another or from an agent to the principal. However, the Managers cite to section 349 of Tegland's treatise, in which he states that even the narrower Washington version of ER 801 is most likely broad enough to include admissions to the principal. 5B K. Tegland, Wash. Prac. § 349 (3d ed. 1989). We agree and hold that these statements were also properly admitted.

Tradewell also argues that the trial court erred in not permitting defendants' proposed instruction 43. The clerk's papers do not contain an instruction with that number. Tradewell's brief indicates that the proposed instruction limited the admissibility of the statements only against defendant Tradewell. However, the facts indicate that Dugdale, Fox, and Friedrichsen were carrying out Stewart's orders, so the limiting instruction would not have been appropriate. In any event, Tradewell was able to argue its theory regarding limited admissibility under the general agency instruction given by the court, instruction 5.

## AGE DISCRIMINATION INSTRUCTIONS

Tradewell argues that the trial court erred in giving instruction 14, which did not use proposed language that the Managers must prove that "but for" their age, they would not have been discharged. Tradewell also contends that the trial court failed to define the phrase "determining factor". Tradewell further contends that the trial court's instruction 13, utilizing the terms "unlawful criteria" and "misjudged" was incorrect. Finally, Tradewell argues that the trial court erred in failing to give defendants' proposed instruction 8, regarding whether an employer is required to find another position for a discharged employee.

Instruction 14 reads as follows:

> Each of the plaintiffs claims that the defendant employer treated him less favorably than younger store managers because of his age. In order to establish liability for unlawful age discrimination arising out of plaintiff's termination, the plaintiff bears the burden of proving by a preponderance of the evidence each of the following elements:
>
> 1. That he was terminated;
> 2. That at the time of his termination, he was over 40 years of age;
> 3. That he was performing his job in a satisfactory manner; and
> 4. That his duties were assumed by a younger employee with qualifications similar to his own.
>
> If you find the plaintiff has failed to establish all of these elements, your verdict must be for defendant on the issue of plaintiff's termination.
>
> If you find that the plaintiff has established each of these elements, then you must determine whether defendants have introduced evidence of a legitimate, nondiscriminatory reason for the termination of plaintiff. If you find that the defendants have failed to introduce evidence of a legitimate, nondiscriminatory reason for its action against plaintiff, then your verdict must be for plaintiff on the issue of plaintiff's termination.
>
> If you find that the defendants have introduced evidence of a legitimate nondiscriminatory reason for its actions against the plaintiff, the plaintiff must then prove that the legitimate reasons offered by the defendants were not true reasons, but were merely a pretext for discrimination.
>
> The plaintiff's burden to show pretext may be met by showing:
>
> 1. That a discriminatory reason more likely motivated the defendant employer; or

2. That the defendant employer's explanation is not credible.

In order to establish that a discriminatory reason more likely motivated the defendant employer, the plaintiff must prove that age was a determining factor in his termination. If you find that plaintiff's age was a determining factor in his termination, your verdict must be for plaintiff.

In deciding whether plaintiff's age was a determining factor in the decision by defendants to terminate plaintiff's employment, you need not find that his age was the sole factor.

In *Grimwood v. University of Puget Sound, Inc.,* 110 Wn.2d 355, 753 P.2d 517 (1988), the Washington State Supreme Court set forth the appropriate burden of proof in an age discrimination case. The *Grimwood* court noted that in *Roberts v. ARCO,* 88 Wn.2d 887, 568 P.2d 764 (1977), the Washington Supreme Court examined federal cases construing the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 *et seq.* (1976), and adopted the elements required to make a prima facie showing of age discrimination. These elements were first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). They are:

(1) that the employee was within the statutorily protected age group;[3] (2) was discharged; (3) was doing satisfactory work; and (4) was replaced by a younger person.

*Grimwood,* at 362.

Once a plaintiff has made a prima facie case, the employer must show a legitimate, nondiscriminatory reason for the termination. The burden here for the employer is only production, not persuasion. After the employer fulfills his or her burden of production, the plaintiff must satisfy his or her burden of persuasion and show that the employer's reason is a mere pretext for a discriminatory purpose. *Grimwood,* at 364.

The *Grimwood* court also quoted with approval from *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st Cir. 1979):

---

[3]Under RCW 49.60.205, that protected age group consists of individuals between the ages of 40 and 70.

> While we conclude that *McDonnell Douglas* provides an appropriate and workable formula for the trial of age discrimination cases, it should not be used inflexibly as a vehicle for organizing evidence or presenting a case to a jury. Above all, it should not be viewed as providing a format into which all cases of discrimination must somehow fit.

*Grimwood,* at 363 (quoting *Loeb,* at 1016–17).

Subsequently, in *Stork v. International Bazaar, Inc.,* 54 Wn. App. 274, 774 P.2d 22 (1989), Stork argued that she had made out a prima facie case of age discrimination through the use of direct evidence of discrimination, rather than by using the *McDonnell Douglas* factors. The *Stork* court first acknowledged that the federal courts have recognized that a prima facie case of age discrimination can be made out in three ways:

> First, a plaintiff may produce evidence proving all prongs of the test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Price v. Maryland Casualty Co.,* 561 F.2d 609 (5th Cir. 1977). . . . Second, a plaintiff can make out a prima facie case by direct evidence of discriminatory intent. Third, a prima facie case may be established by statistical proof of a pattern of discrimination.

*Stork,* at 278 (quoting *Buckley v. Hospital Corp. of Am., Inc.,* 758 F.2d 1525, 1529 (11th Cir. 1985)).

The *Stork* court went on to note that in applying the *McDonnell Douglas* analysis and the direct evidence, the federal courts have made certain distinctions:

> Under the *McDonnell Douglas* test plaintiff establishes a prima facie case when the trier of fact *believes* the four circumstances [set forth in that case] which give rise to an *inference* of discrimination. Where the evidence for a prima facie case consists . . . of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the prima facie evidence the ultimate issue of discrimination is proved; no inference is required. Defendant cannot rebut this type of showing of discrimination simply by articulating or producing evidence of legitimate, nondiscriminatory reasons. . . .

*Stork,* at 280 (quoting *Buckley, supra* at 1529–30).

The *Stork* court stated that although the *Grimwood* court recognized the distinction adopted in the federal

courts, it did not adopt such a distinction. Rather, the *Grimwood* court emphasized that the burden of persuasion remains with the plaintiff. *Stork,* at 279 (citing *Grimwood,* at 363). Thus, the *Stork* court declined to distinguish between direct evidence and the *McDonnell Douglas* prima facie case, in an attempt to maintain a uniform procedure for bringing discrimination actions. The *Stork* court also decided that such a distinction between direct and indirect evidence was unnecessary:

> Not only is any such distinction impracticable from the standpoint of instructing a jury,[4] but the necessity for making such a distinction is circumvented under the *McDonnell Douglas* analysis by allowing direct evidence to be used to satisfy the plaintiff's burden of showing pretext.

*Stork,* at 282.

With this framework in mind, we turn to the question of appropriate jury instructions.

In *Loeb v. Textron, Inc., supra* at 1009, the jury was instructed as to the employer's motive as follows:

> "If you find by a preponderance of the evidence, that Plaintiff's age was one factor in the decision to demote or discharge him, and, Plaintiff's age made a difference in determining whether he was demoted, or retained or discharged, then you must find for Plaintiff . . .. Plaintiff need not prove that his age was the sole factor affecting the decision to demote or discharge him provided he can show that age contributed to or affected the decision to demote or discharge."

The *Loeb* court stated that the language that plaintiff's age "made a difference" in determining whether he was discharged was insufficient to convey the proper legal standard to the jury. According to the *Loeb* court:

> the [trial] court should have instructed the jury that for plaintiff to prevail he had to prove by a preponderance of the evidence that his age was the "determining factor" in his discharge in the sense that, "but for" his employer's motive to

---

[4]The *Stork* case was tried to a judge, and *Grimwood* was a summary judgment case.

discriminate against him because of age, he would not have been discharged.

*Loeb,* at 1019. *See also Kelly v. American Standard, Inc.,* 640 F.2d 974 (9th Cir. 1981).

Tradewell argues that the trial court's instruction here was erroneous because it failed to use the "but for" language. According to Tradewell's brief, the trial court was initially prepared to give defendants' proposed instruction 16. However, the Managers' counsel argued that the "but for" definition of "determining factor" was improper and, according to Tradewell's brief, denounced the "but for" test as the highest and most difficult standard of proof. The language that Tradewell argues was erroneously omitted would have immediately followed the end of the instruction given as follows:

> However, it is not enough for you to find that plaintiff's age entered into defendants' decision. In order for you to find that plaintiff's age was a "determining factor," you must find that, but for his age, plaintiff would not have been discharged.

The analysis in *Loeb* suggests that "determining factor" and "but for" are meant to be synonymous. The Managers argue that "determining factor" is a term with a commonly understood dictionary meaning of "causal" or "deciding". The *Loeb* court did not suggest that "determining factor" necessarily required any further definition.

We hold that the instruction was sufficient. As the Managers correctly argue, instructions are sufficient if, when taken together, they allow the parties to argue their theories of the case, are not misleading, and accurately inform the jury of the applicable law. *Gammon v. Clark Equip. Co.,* 104 Wn.2d 613, 707 P.2d 685 (1985). The trial court's instruction here informed the jury of the applicable law, using the "determining factor" language, and Tradewell was still able to argue its theory that business necessities, rather than age, motivated its decisions to terminate the Managers.

Tradewell also argues that the trial court erred in giving instruction 13, which reads as follows:

The Washington discrimination statute does not obligate an employer to accord preference to older employees. Rather, the employer has discretion to choose among equally–qualified employees, providing the decision is not based upon unlawful criteria. The fact that you may think that the employer misjudged the qualifications of the employees does not in itself expose the employer to liability under the Washington discrimination statute, although this may be probative of whether the employer's reasons are pretexts for discrimination.

Tradewell first argues that the sentence containing the words "equally–qualified employees" was misleading. However, Tradewell's exception to this instruction at trial did not discuss the "equally–qualified employees" phrase. It was not until its motion for a judgment notwithstanding the verdict that this issue was raised. This is not timely. If a party fails to take exception to an instruction, it becomes the law of the case. *Connor v. Skagit Corp.*, 30 Wn. App. 725, 638 P.2d 115, *aff'd*, 99 Wn.2d 709, 664 P.2d 1208 (1981). Tradewell also contends that the term "unlawful criteria" is vague and ambiguous, but provides no argument. Assignments of error unsupported by legal argument will not be considered on appeal. *Island Cy. v. Mackie*, 36 Wn. App. 385, 675 P.2d 607, *review denied*, 101 Wn.2d 1008 (1984).

Tradewell also argues that the portion of the instruction regarding whether an employer misjudges an employee's qualifications is error. Tradewell contends that evidence of misjudgment is not probative of "pretext", but does not elaborate as to why this is so. We find no error in this instruction. If an employer is mistaken, this does not constitute discrimination. However, the jury can examine the claimed mistake to see if it is mere pretext. This is an accurate statement of the law.

Tradewell also argues that the trial court erred in refusing to give two proposed instructions. Defendants' proposed instruction 9 reads as follows:

It is not your responsibility to determine whether defendant Tradewell had a good reason for terminating plaintiffs' employment. You are being asked to determine only whether

the age of each plaintiff was a determining factor in that termination. Therefore, even though you may feel that defendant Tradewell made a bad decision or it acted unreasonably or unfairly, your verdict must be for all of the defendants on the issue of age discrimination unless you find that the age of a plaintiff was a determining factor in his termination.

While this instruction does not misstate the law, it would seem to be superfluous in light of instructions 13 and 14. The absence of a specific instruction on a matter at issue is not error if the instructions given clearly inform the jury of the applicable law regarding that issue and permit each party to argue his theory of the case. *Crossen v. Skagit Cy.*, 100 Wn.2d 355, 669 P.2d 1244 (1983).

Defendants' proposed instruction 8 reads as follows:

The state discrimination law does not compel an employer to offer to an employee who is discharged another position with the employer.

Tradewell argues that the jury might have believed that Tradewell unlawfully discriminated because it offered non-managerial positions to some of the Managers, but not to others. However, the jury was instructed in instruction 13 that the employer has discretion to choose among equally qualified employees, and the instructions also required the Managers to show, not that they were not given replacement positions, but that they were fired for discriminatory reasons. These instructions enabled Tradewell to argue its theory that its actions with regard to some of the Managers did not constitute discrimination. There was no error.

### "HANDICAP DISCRIMINATION" INSTRUCTIONS

Tradewell argues that the trial court erred in giving instruction 16, concerning handicap discrimination, because it discussed Tradewell's ability to accommodate Miller's perceived handicap. The trial court's instruction 16 stated as follows:

In order to establish liability for unlawful handicap discrimination, plaintiff Miller must prove the following two propositions:

1. That he was either handicapped or perceived to be handicapped by the defendant; and

2. That this real or perceived handicap was the reason for the defendants' actions towards Miller *or that the defendants could have reasonably accommodated Miller's real or perceived handicap.*

"Handicap" means the presence of a sensory, mental or physical condition, which is either:

1. Medically cognizable or diagnosable; or
2. Exists as a record or history; or
3. Is perceived to exist, whether or not it exists in fact.

If you find that plaintiff Miller has proved each of the above propositions, then you should find for him on his handicap discrimination claim. If you find that plaintiff Miller has not proved each of the above two propositions, then you should find for the defendants on this claim.

(Italics ours.)

Tradewell argues that defendants' proposed instruction 17, which was refused, comports with a Washington State Supreme Court case, *Phillips v. Seattle,* 111 Wn.2d 903, 766 P.2d 1099 (1989), and is a correct statement of the law. The trial court's instruction differs from Tradewell's proposed instruction in two ways. The trial court's instruction defines "handicap" using language also contained in *Phillips,* at 907, while Tradewell's instruction has no definition.

In addition, the emphasized portion of the court's instruction is not present in Tradewell's proposed instruction. Tradewell argues that this was not an accommodation case. However, it cites *Phillips* with approval, and *Phillips* was an accommodation case. It dealt with the issue of what constituted reasonable accommodation by an employer and quoted WAC 162–22–080(1) as follows:

It is an unfair practice for an employer to fail or refuse to make reasonable accommodations to the sensory, mental, or physical limitations of employees, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business.

*Phillips,* at 911. The language in the instruction is a correct statement of the law. There was no error.

### INSTRUCTION ON AIDING AND ABETTING DISCRIMINATION

Tradewell contends that the record is devoid of any evidence that FSA or Stewart in his personal capacity aided

and abetted discrimination. The trial court's instruction 17 stated as follows:

> There is a provision in the Washington Law Against Discrimination which provides:
>
> It is an unfair practice for any person to aid, abet, encourage, or incite the commission of any unfair practice, or to attempt to obstruct or prevent any other person from complying with the provisions of this chapter or any order issued thereunder.
>
> If you find that Tradewell engaged in discriminatory conduct against a plaintiff, that plaintiff has the burden of proving by a preponderance of the evidence that Food Services of America and/or Thomas Stewart engaged in some conduct which aided, abetted, encouraged or incited Tradewell's discriminatory conduct against the plaintiff.
>
> If you find that Food Services of America and/or Thomas Stewart has engaged in some conduct which aided, abetted, encouraged or incited Tradewell's discriminatory conduct against a plaintiff, then you should find for that plaintiff on his aiding and abetting claim, and you should award that plaintiff any damages which you find were proximately caused by Food Service[s] of America's and/or Thomas Stewart's conduct. If you find that a plaintiff has not met his burden, you should find for Food Services of America and/or Thomas Stewart on the plaintiff's aiding and abetting claim.

With respect to FSA, Tradewell is correct that there is no evidence that it committed any act *in addition to the actions of Stewart* that could be considered to be aiding and abetting discrimination. However, Stewart had an ownership interest in Miller–Cascade and was executive vice–president of Miller–Cascade at the time it acquired Tradewell in 1986. The president of Miller–Cascade reported to Stewart. On the basis of Stewart's status as owner and corporate officer, we hold that Miller–Cascade (now FSA) could be found liable for Stewart's actions.

At the same time, Tradewell argues that there is no evidence that Stewart aided and abetted discrimination in his individual capacity, but rather, that it was only his company, Tradewell, that discriminated. It is true that there does not appear to be clear evidence of aiding and abetting, apart from Stewart's direct actions. However, the record supports a determination that Dugdale was carrying out

Stewart's instructions, and thus supports a finding that Stewart committed age discrimination.

■ While this means that the aiding and abetting instruction was unnecessary, any error is harmless. Tradewell does not argue, and the record does not support, that the judgment against Stewart and FSA was monetarily enhanced by the jury's determination that they aided and abetted discrimination. Therefore, Stewart and FSA were not prejudiced by the erroneous instruction. The instruction did not prevent them from arguing their theory of no liability on the part of Stewart and FSA because they could still argue that only Tradewell committed discrimination.

## NEGLIGENT MISREPRESENTATION

An examination of the judgment on the verdict indicates that the trial court did indeed strike the $5,000 awarded to each manager for negligent misrepresentation. Therefore, in the absence of prejudice, this court need not consider the question of whether the negligent misrepresentation is a cause of action in this state or whether the instruction was proper.

## SUFFICIENCY OF THE EVIDENCE

■ A judgment notwithstanding the verdict is proper when, viewing the evidence in the light most favorable to the nonmoving party, the court can say as a matter of law that the verdict is not supported by substantial evidence. *Cowsert v. Crowley Maritime Corp.*, 101 Wn.2d 402, 680 P.2d 46 (1984).

Viewing the evidence in the light most favorable to the Managers, we hold that substantial evidence supports the verdict. The Managers presented their prima facie cases of age discrimination and rebutted Tradewell's contention of business reasons for the discharge by showing direct evidence of age discrimination through evidence of Stewart's philosophies and also by showing how well the Managers performed their jobs.

## FRONT PAY

Front pay was awarded in substantial sums to each plaintiff. In each case, the front pay awards were substantially greater than the awards for back pay. On the issue of front pay, the trial court instructed the jury in instruction 23 as follows:

> 2. If you find that a plaintiff but for his termination by Tradewell could have been employed by the purchasers of the Tradewell Stores you may award "front pay." This is the reasonable value of wages, bonus and benefits lost for a reasonably certain period of time that does not exceed the likely duration of employment with the purchaser of the Tradewell Store less any wages, benefits or bonus actually earned or which might have been earned by the exercise of reasonable diligence in other employment, whether the plaintiff is an employee or is self-employed.

The only exception taken by defendants to the instruction on front pay is as follows:

> Under the circumstances we think it is inappropriate to go to the jury on front pay. We feel it is inappropriate to instruct the jury on the issue of front pay because this is something within the sphere of the Court rather than the jury, for the reasons set forth in our trial memoranda, including the *Ventura [v. Federal Life Ins. Co.,* 571 F. Supp. 48 (N.D. Ill. 1983)] case, which concludes "that it is more important for the Court than the jury."

Report of Proceedings, at 4168.

Tradewell assigned error to giving instruction 23 on damages and stated the issue on "front pay" as follows:

> Is front pay too speculative for a jury's consideration and inapplicable when the employer terminated the business in which the plaintiffs were employed?

Brief of Appellants, at 3.

In addressing the issue of front pay in its brief, Tradewell argued that because of its speculative nature, the question of front pay is not a jury issue. Rather, it is an issue to be decided by the court after the jury has determined liability. In support of this contention, appellants cite *Ventura v. Federal Life Ins. Co.,* 571 F. Supp. 48 (N.D. Ill. 1983) and *Graefenhain v. Pabst Brewing Co.,* 670 F. Supp. 1415 (E.D. Wis. 1987).

In *Ventura,* the court decided that under the ADEA, 29 U.S.C. § 621 *et seq.,* the court could award future pension benefits that would have accrued had the plaintiff's employment continued past the date of his wrongful discharge and continued until the time of his normal retirement. The court stated that its power to award prospective benefits was within its equitable remedial powers under the ADEA.

*Graefenhain* does not appear to support the proposition it is cited for by Tradewell, as the parties in that case stipulated that the issue of the damages to be awarded for a wrongful discharge would be tried to the court. The cited cases reflect that there are circumstances where some circuits permit prospective damages to be addressed by the trial court under its equitable powers to award full compensation in ADEA cases.

However, there are other federal circuits which hold that once the trial court determines that the award of front pay is appropriate under the facts of a given case, the amount of front pay should be determined by a jury. These are often cases where reinstatement is not an available remedy. *Davis v. Combustion Eng'g, Inc.,* 742 F.2d 916 (6th Cir. 1984); *Fite v. First Tenn. Prod. Credit Ass'n,* 861 F.2d 884 (6th Cir. 1988); *Cassino v. Reichhold Chems., Inc.,* 817 F.2d 1338, 1347 (9th Cir. 1987), *cert. denied,* 484 U.S. 1047 (1988).

In *Blum v. Witco Chem. Corp.,* 829 F.2d 367 (3d Cir. 1987), the court rejected the same argument Tradewell makes here, stating at page 375:

> We are aware that the speculative nature of future damages has been cited as a reason for denying such awards. *See, e.g., Loeb v. Textron, Inc.,* 600 F.2d 1003, 1013 (1st Cir.1979). However, we agree with the court in *Koyen [v. Consolidated Edison Co.,* 560 F. Supp. 1161, 1168–69 (S.D.N.Y. 1983)] that "the problem is more imaginary than real." Courts and juries have been calculating future damage awards in personal injury cases for years.

29 U.S.C. § 626(c)(2) provides:

[A] person shall be entitled to a trial by jury of any issue of fact in any such action for recovery of amounts owing as a result of a violation of this chapter, regardless of whether equitable relief is sought by any party in such action.

This amendment in 1978 would appear to eliminate any question about the right of a plaintiff to have his damages determined by a jury in federal cases.

 Tradewell cites no state authority supporting this assignment of error. This case was filed under RCW 49.60 and RCW 49.44.090. RCW 49.60.020 states in part:

Nor shall anything herein contained be construed to deny the right to any person to institute any action or pursue any civil or criminal remedy based upon an alleged violation of his civil rights.

RCW 49.60.030(2) provides:

Any person deeming himself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, to recover the actual damages sustained by him, or both, together with the cost of suit including a reasonable attorney's fees [sic] or any other remedy authorized by this chapter or the United States Civil Rights Act of 1964;

We find no support for Tradewell's contention in our case law or antidiscrimination statutes. Tradewell cites *Roberts v. ARCO,* 88 Wn.2d 887, 568 P.2d 764 (1977) for the proposition that Washington considers front pay too speculative for a jury's consideration.

Roberts sued, alleging age discrimination by his employer, ARCO. He offered expert testimony pertaining to his loss of future income. The trial court excluded the testimony because it was based on an assumption that Roberts had a guaranteed lifetime employment contract and because the conclusions were completely speculative. *Roberts,* at 898. The expert's testimony was excluded because of inherent weaknesses in the conclusions of the witness and the basis for those conclusions. The court was

not holding that front pay issues could never be decided by a jury.[5]

The trial court did not err in submitting the front pay issues to the jury.

## LOST BUSINESS OPPORTUNITY

Tradewell assigns error to the admission of lay testimony on lost business opportunity and also asserts that lost business opportunity damages were duplicative of front pay damages.

The jury awarded $37,500 damages for lost business opportunity to plaintiffs Hasson, Pannell, and Adler. Those three plaintiffs recovered front pay awards of $235,235, $166,937, and $219,492, respectively. The theory of lost business opportunity was based upon testimony by the plaintiffs that had they been given an opportunity to purchase the Tradewell Stores when they were sold, they would have done so. The Managers argue on appeal that the jury could have found that each plaintiff would have purchased a grocery store, paid himself a salary as manager, and earned profits on his equity.

▇▇▇ Front pay was recovered as compensation for a loss occurring during the same time period as one would earn income from a store he was allowed to purchase following his discharge. The damages awarded for lost business opportunity are duplicative of the front pay awards. A plaintiff is not entitled to recover for lost wages and benefits from employment during the same period he is earning profits from self–employment. If both did occur at the same time, the lost business opportunity damages would have to be deducted from the loss of wages and benefits in determining the net front pay award. That was not done here.

At page 24 of the plaintiffs' trial brief, the theory of damages for loss of business opportunity was asserted as an *alternative* to front pay, thus acknowledging that a plaintiff

---

[5]It should also be noted that the *Roberts* court held plaintiff did not make out a prima facie case of age discrimination. Thus, it would appear that its ruling on the exclusion of evidence relating to damages was dicta.

could not recover damages for both. As a matter of law, we find the lost business opportunity damages duplicative of the front pay awards. The judgments in favor of Hasson, Adler, and Pannell are each to be reduced in the amount of $37,500.

## Back Pay

Tradewell contends the jury awards are not supported by the evidence and that the jury should have been instructed that back pay could not be awarded for any time beyond November 1, 1988. Tradewell asserts that it operated no grocery stores beyond that date, and that it excepted to the court's failure to give its proposed instruction 39, which contained the statement, "Plaintiff is not entitled to any damages beyond November 1, 1988." The proposed instruction was erroneous because it did not apply the November 1, 1988, limitation to back pay only. It would have operated, if given, as a complete defense as a matter of law to any award of front pay. In this respect, Tradewell's proposed instruction 39 was erroneous. The trial court is free to reject any proposed instruction which is erroneous in any respect. *Crossen v. Skagit Cy.*, 100 Wn.2d 355, 360, 669 P.2d 1244 (1983).

Tradewell's exception to instruction 23 included no exception of any kind to the portion of the instruction relating to back pay. The grounds of an objection to an instruction must be stated with specificity, and the failure to comply with this requirement precludes consideration on appeal. CR 51(f); *Haslund v. Seattle*, 86 Wn.2d 607, 614, 547 P.2d 1221 (1976). The trial court did not err in instructing the jury on back pay.

## Costs

Tradewell contends the Managers should not have been awarded costs because the cost bill was not timely filed. They also contend it was error to award as costs actual expert witness fees and the entire cost of depositions.

The trial court awarded respondents costs in the amount of $95,527.80. Included in this amount was approximately

$21,000 for depositions and over $24,000 in fees paid to expert witnesses.

Appellants first contend the cost bill was untimely. RCW 4.84.090 requires that a cost bill be served and filed within 10 days after the judgment. Respondents did not comply with the 10–day requirement. The judgment was entered May 4, 1989. The trial court, at a hearing on May 2, 1989, set a hearing to settle attorney's fees and costs for May 23, 1989. On May 2 and again on May 16, the Managers sent to Tradewell's counsel materials supporting their claim for costs. At a hearing on fees and costs on May 25, the trial court ruled it would not deny costs for failure to timely file a cost bill because of the court's concern that the Managers' counsel could have reasonably believed that the statutory requirement for filing a cost bill had been waived because a hearing date to determine costs had been set. Tradewell does not claim to have been prejudiced by the failure of the Managers to comply with RCW 4.84.090. Under these circumstances, the trial court did not abuse its discretion in entering a judgment for costs.

RCW 49.60.030(2) provides for costs as follows:

> Any person deeming himself injured by any act in violation of this chapter shall have a civil action in a court of competent jurisdiction to enjoin further violations, to recover the actual damages sustained by him, or both, together with the cost of suit including a reasonable attorney's fees [sic] or any other remedy authorized by this chapter or the United States Civil Rights Act of 1964 . . ..

In *Shannon v. Pay 'N Save Corp.*, 104 Wn.2d 722, 709 P.2d 799 (1985), the Washington Supreme Court addressed the issue of whether expert witness fees were included in "cost of suit" under RCW 49.60.030(2). The court held:

> There is no dispositive distinction between "costs" as used in RCW 4.84.030 and "cost of suit" as used in RCW 49.60.030(2). Accordingly, a plaintiff cannot recover expert witness fees in excess of compensation paid to an ordinary witness.

*Shannon,* at 736.

However, in *Blair v. WSU,* 108 Wn.2d 558, 740 P.2d 1379 (1987), the Supreme Court again dealt with the

question of a definition for the term "cost of suit" as used in RCW 49.60.030(2). In *Blair,* the trial court had awarded the plaintiff costs, including those for travel, copying, telephone, deposition, and expert witnesses. Without any reference to the *Shannon* case, the *Blair* court said that since it had not previously decided the scope of costs under RCW 49.60, it would look to federal authority for direction. After review of federal authorities, the court stated:

> In this case, however, we adopt the federal rule allowing more liberal recovery of costs by the prevailing party in civil rights litigation, in order to further the policies underlying these civil rights statutes: to make it financially feasible to litigate civil rights violations, to enable vigorous enforcement of modern civil rights legislation while at the same time limiting the growth of the enforcement bureaucracy, to compensate fully attorneys whose service has benefited the public interest, and to encourage them to accept these cases where the litigants are often poor and the judicial remedies are often nonmonetary. *Dowdell [v. Apopka, Fla.,* 698 F.2d 1181, 1189–91 (11th Cir. 1983)]. The great weight of authority allows a prevailing civil rights plaintiff to recover reasonable expenses incurred.

*Blair,* at 573. The court then held that the trial court did not abuse its discretion in awarding the challenged costs. *Blair,* at 574.

While the failure of the *Blair* court to mention the *Shannon* case is puzzling, it is implicit in the reasoning of the *Blair* court that *Shannon* has been overruled *sub silentio.* The action of the trial court in allowing recovery of costs of depositions and expert witness fees is authorized by *Blair,* and the trial court did not err in doing so.

## ATTORNEY'S FEES AT TRIAL

The trial court awarded the Managers attorney's fees in the amount of $501,874. Tradewell asserts that this award was excessive and unreasonable. The only argument Tradewell advances in support of this contention is that the Managers did not prevail on all issues.

The trial court found that the Managers' claims were based upon a common core of facts and that no reasonable segregation of successful and unsuccessful claims could be made. This was a judgment clearly falling within

the trial court's discretion. Tradewell's argument against the award cannot be sustained.

### PREJUDGMENT INTEREST

The Managers cross–appeal the trial court's rejection of their claims for prejudgment interest on their back pay awards. The trial court entered a finding saying, in part:

> The court finds that the plaintiffs' damages for back pay and front pay were not easily ascertainable or calculable and therefore too indefinite to permit an award of prejudgment interest.

Finding of fact 5(18).

The Managers contend the common law rules on prejudgment interest do not apply to awards of back pay pursuant to RCW 49.60.030(2), which contains a provision for "any other remedy authorized by this chapter or the United States Civil Rights Act of 1964".

In *Loeffler v. Frank,* 486 U.S. 549, 100 L. Ed. 2d 549, 108 S. Ct. 1965 (1988), the Supreme Court acknowledged that the United States Civil Rights Act of 1964 authorizes prejudgment interest as part of the back pay remedy in suits against private employers. *Loeffler,* at 557. 42 U.S.C. § 2000e–5(g) is cited by the federal courts as authority for the awarding of prejudgment interest. The cited section authorizes "any other equitable relief as the court deems appropriate", but does not specifically address the subject of prejudgment interest. While awards of prejudgment interest are authorized where appropriate to make the plaintiff whole, numerous federal cases have held that the award of prejudgment interest on back pay awards is discretionary. *Taylor v. Philips Indus., Inc.,* 593 F.2d 783, 787 (7th Cir. 1979). The federal courts have also held that the fact that the amount of back pay is not readily determinable weighs against awarding prejudgment interest. *Domingo v. New England Fish Co.,* 727 F.2d 1429, 1446 (9th Cir. 1984).

In the case sub judice, the jury was instructed on the subject of back pay in instruction 23 as follows:

> 1. The reasonable value of wages, bonus and benefits lost up until the last day Tradewell reasonably would have employed

each plaintiff as a store manager less any wages, bonuses and benefits actually earned or which might have been earned by the exercise of reasonable diligence in other employment, whether he is an employee or self–employed; this measure of damages is to be called "back pay."

In Washington, prejudgment interest can be awarded only in those cases where the claim is for a fixed sum or the evidence provides a basis for computing the recovery with exactness, without reliance on opinion or discretion. *Hansen v. Rothaus,* 107 Wn.2d 468, 472, 730 P.2d 662 (1986). The *Hansen* case also approves a definition of an unliquidated claim as one

> "where the exact amount of the sum to be allowed cannot be definitely fixed from the facts proved, disputed or undisputed, but must in the last analysis depend upon the opinion or discretion of the judge or jury as to whether a larger or a smaller amount should be allowed."

*Hansen,* at 473 (quoting *Prier v. Refrigeration Eng'g Co.,* 74 Wn.2d 25, 33, 442 P.2d 621 (1968)).

From the instruction on back pay, it is apparent that discretion was involved in determining the recoveries in each case. The instruction set the cutoff date as "the last day Tradewell reasonably would have employed each plaintiff as a store manager". Furthermore, the jury had to deduct "any wages, bonuses and benefits actually earned or which might have been earned by the exercise of reasonable diligence in other employment". Fixing the cutoff date and calculating the deduction of earnings clearly requires discretionary findings and conclusions which would affect the amounts to be recovered for back pay.

Under these circumstances, the trial court's denial of prejudgment interest is in accord with Washington law. Since the federal law also permits the exercise of discretion, especially where the amount of the recovery is not readily ascertainable and therefore uncertain, there is no basis for finding an abuse of discretion by the trial court in denying prejudgment interest.

450

ATTORNEY'S FEES ON APPEAL

Pursuant to RAP 18.1, the Managers claim they are entitled to attorney's fees on appeal. As noted above, RCW 49.60.030(2) provides that a person injured by a discriminatory act may collect costs and reasonable attorney's fees as part of his recovery, together with his actual damages. Such a provision necessarily includes attorney's fees on appeal. *See Blair v. WSU, supra.* We therefore award the Managers reasonable attorney's fees on appeal and refer this case to the commissioner for determination of the proper amount.

The awards to plaintiffs Hasson, Pannell, and Adler for lost business opportunity in the amount of $37,500 each are reversed, and thus, the damages awards to each of these three are reduced accordingly. The trial court is affirmed in all other respects.

WEBSTER, A.C.J., and KENNEDY, J., concur.

After modification, further reconsideration denied August 29, 1991.